Case No. 09-1985, Liberty Mutual Fire Insurance v. Woodfield Mall LLC. Liberty Mutual. Good morning, gentlemen. Step up, will you, please, and tell us who you are. Jeremiah Connelly from Bowdoin, Chebrew, Berry, and Garvey, on behalf of the appellant. Good morning, Mr. Connelly. Good morning. Good morning, Your Honors. Joseph Costell from Lindsey, Rappaport, and Costell. Costell is how you pronounce it. Yes. The accent on the second syllable. And I represent Liberty Mutual Insurance Company. Very well. I think you can safely assume that we are familiar with your briefs. Mr. Connelly, you can save out from your 15 minutes any portion you wish for a response. Thank you. You're welcome. Good morning, Your Honors. With regard to Woodfield Mall and the mall defendants, they were named additional insureds on the Lenscrafter policy. The policy of insurance insures additional insurers for claims arising out of Lenscrafter's work or, importantly here, work performed on their behalf. What happened here was Lenscrafter hired a carrier employee. Does that usually mean someone outside the business of what they do? That's how I interpret it, Your Honor. It's work being done on their behalf. It's not generally interpreted as their business, the kind of work they do. In other words, retail establishment, selling eyeglasses, et cetera. Respectfully, I would expect that language to say very clearly because insurance policies do say employees when they want to, and all it had to say was work performed by you or your employees. And so it is our thoughts, work performed on their behalf. So they bring in an outside worker to do some repair on an air-conditioning HVAC unit. That is theirs, and that is their responsibility. And I don't think there's any question in this case, but that the work that was being done at the time of the plaintiff's accident was being done on behalf of Lenscrafters. I think the tricky issue in the case is whether or not it's a claim that arises out of the work that's being performed on behalf of Lenscrafters. Well, isn't it the case first of whether or not the judge properly concluded that Ohio law applies? Correct. Isn't that the premier issue here? It is, and I was just going to say that, in relation to the interpretation of arising out of. So arising out of, I guess it's our position, the interpretation of that is the key, and then you get to, okay, how do we interpret it? And then therein lies the big issue, which is, is it Ohio or is it New York or Illinois? What if it's Ohio? Give us your best Ohio case. I've got serious problems if it's Ohio. I'm still making the argument that if it's Ohio law that applies, this still arises out of, but I'm not going to sit here in front of the three of you and tell you that there isn't some, there's a reason they want Ohio law to apply. It's much more favorable to them, much more restrictive. It is almost a situation where you almost have to. Award summary judgment. Yeah. If you apply Ohio law, that's what you get. I just wanted to note, because you do make a lukewarm argument in your brief about Ohio law, and I just wanted to leave that up here. I'd rather not lose any credibility on that issue. I think Ohio law is a problem for us. And it's a minority view. Yes, it is a minority view. But what does it basically say? Ohio law? Yes. If you gave it to us in a nutshell, that the liability here under this policy can only be a vicarious situation, it can't result out of your own negligence. That seems to be the general language of their case law, that it almost has to be vicarious. It doesn't give a lot of leeway. It does say, and the window that we left open was, Ohio law does say what the Pekin case said that the Supreme Court came down with this May, and that is that you can consider outside information, outside pleading issues. And so from our standpoint, I'm not sure the door is completely closed, even if you apply Ohio law. I really want New York law to apply. Yes. All right. So then let's hone in on the choice of law for the factors here. So you've got significant context. The location of the subject matter obviously occurred in Illinois. And as I understand the case law, the case law says that you don't have to give equal weight to all of these. You can give a little more weight to some of the issues than others. The fact that the subject matter is here, the fact that Lenscraft is here, the fact that Woodfield is here, the fact that the man lived here who died, ultimately died, and the fact that the accident occurred here, I think that's a pretty significant issue that should be given a fairly significant weight. What about the argument that is made in Emerson and adopted basically by Justice Gordon in his decision in Emerson, and I'm quoting from it, that if you apply the law of the site, which is what you're arguing that we should do, it creates the result that this insurance policy could be interpreted differently in different locations because you face the prospect of future litigation involving this particular insured. Emerson's, I'm sorry. Okay. Where the law of different states would apply, the site, and you get a different result under the same language of the policy. That's a key point, and Emerson is a key case. And our position, our interpretation. Well, thank you for that. Well, I'm glad you asked about Emerson. I do think that it's a key case, and I'm sorry I haven't gotten to it as quickly. But how we interpret Emerson, Your Honor, is Emerson stands for the proposition of when you have multiple subsidiaries and you have multiple accident sites and you've got a big policy like you have in this case, the Emerson court says handle it with Missouri law because Missouri is where the first named parent company is from. And it ensures that there will be uniform application of the policy language. That is correct. And so in this case, if you follow Emerson, and we suggest and encourage you to do so, we believe that the company Luxottica is the parent company, and they were incorporated in New York. And therefore, if we want to follow Emerson, and I think it's very powerful. So we should use New York rather than Ohio. That's correct. That is our position. That's how you square your position with Emerson. Absolutely. Okay. Another issue on the significant. But what about the notion that in this case, Luxottica, if I'm pronouncing it right, the parent company is really not where our focus should be because the contract that gave rise to the mall's coverage claim is the lease between LensCrafters and the mall. And I appreciate that, and that's certainly the suggestion of the appellee. But this is where you get into the dangerous area of looking at side issues when what we need to do from our perspective and a follow-up to just have consistency. Here we've got covered risks which could arise anywhere in the country because that's what LensCrafters is. All over. Right. It's not really Luxottica. And so how do we pick one place? And Emerson says, go to the first name. Let's try to make it simple and consistent. If you start looking at other issues, well, who wrote what where, and somebody wrote a letter, and somebody made a phone call negotiating it, now I think we're getting into areas where we can create a lot of inconsistency in the law. Emerson lays down a nice, simple pattern for us to follow. You've got the parent company. This is the lead company. This is the company that's in charge and controls all these other companies. Let's set down a good, simple precedent that is clear for everybody. If we start looking at some of these side issues, I think we run into the inconsistent exposure in analyzing some of these issues. The place of delivery, they say it was delivered in Ohio. The declaration page. What is the headquarters of? Let's go back to LensCrafters for a moment. Where are they principally? I believe they're in Ohio. The headquarters, I believe, of Luxic. Where was the policy procured? Well, the affidavit of the LensCrafters individual indicates that some negotiations arose out of Ohio. The documents indicate. Was the policy delivered in Ohio? It was, wasn't it? Well, their affidavit says yes. The declaration page says it was mailed to and delivered to New York at Luxottica. It may have been delivered to both, so their affidavit may be correct, but the declaration page shouldn't be ignored. That's where it says that it was sent to, the parent company in New York. And so I don't, the answer to that question is I don't really know, and it may have been sent to any number of places. Would it, could it be, would it be fair to say that given the factual matrix here with LensCrafters focused in Ohio and its parent company focused in New York, or located in New York, are there any public policy issues that could be used to try to pick New York over Ohio? That's a softball for you. Apparently I'm no better at baseball now than I was when I was in high school. Well, New York's closer to Illinois law than Ohio's. Well, it certainly is. And it's admitted, well, if it's not admitted, it's at least suggested in the record that Ohio's attitude toward these kinds of contracts is an anomaly when you look at the rest of the states. It is. There are 33 subsidiaries to be considered here, too, and I don't care where their headquarters all are, but, again, it's one policy with multiple named insured, 33 subsidiaries, and we're all sitting here trying to figure out what's the sensible way to try to determine whose law should apply. If we decide Ohio, Ohio's going to determine the interpretation of this policy, and we've got 33 subsidiaries, one of which at least we don't have all of them in terms of where they're located. I guess I want to go back to the first idea. Sure. You're suggesting we should sort of ignore LensCrafters but really look at Luxottica. Why? Because they're the parent company. Isn't this about LensCrafter? Isn't it about their policy? Why are we going above? Aren't they a separate corporation, and they're the ones that have these offices or these retail establishments all over the United States? Yes, but they're just one insured out of 34 or 33 or so.  That's where this thing comes from. Correct. With the LensCrafters calling carrier who sent out a guy who came to the Woodfield Mall who went to LensCrafters, then left LensCrafters, went out and got injured, and unfortunately and tragically was killed. My position is you're inviting possibly 34 different interpretations then, depending on the next company on the same policy who's sued in some other state and has a headquarters in another state, some of which are New York. So going back to Emerson, do you want that? And if you want that, that's your determination. But that invites us determining, okay, in this case that policy is read this way, but in 33 other cases it could be read completely differently. And since Ohio is the minority law, we know the likelihood for that is huge. And that's not, I don't think, the goal or intent. I'm just trying to get through why we're going off to Luxottica. Because they're the parent company and it's their policy. I thought it was LensCrafters' policy. Well, they add in LensCrafters, and so it's their policy. But the policy, as I understand it, is issued. Well, then I guess we could say that if you look at the parent, we've got this nationwide situation. Correct. That's correct. And we're looking for a consistent way to interpret that policy and the terms of it. Regardless of which one of their 33 subsidiaries gets sued in whatever of the 50 states. We want consistent interpretation. Well, I've taken enough of your time, but I'm not going to go down the list of significant conflicts because I know you've read all of that. I do, and if you have any questions, I'm happy to answer them. But I think otherwise I'm wasting your time. I do just want to mention briefly on the waiver issue, in this case, Liberty did get notice of the claim in 2004. They did send a letter in 2005 saying, okay, we're going to investigate it. Then they waited two years to file their deck action. Two years to file their deck action. The first time I see that crop up is in your yellow brief. Did you argue it in your white brief? Well, we argued waiver in our white brief. But you didn't argue the two-year delay in filing the deck action. I didn't see it in our white brief. I didn't either. The first time I saw it was in the yellow brief. That's a no-no. You know that. It's a no-no. We did argue waiver with regard to the actual letters. But did you slip in another issue that hadn't been briefed or argued or even considered by the trial judge? I'm trying to remember the oral argument. Was it raised for the first time on appeal and then only in the yellow brief? And this is not to scapegoat or try to step away. I didn't argue the motion for summary judgment. I don't know whether it was argued. This in paper looks like the first time we specifically mentioned the two-year issue, but we raised the waiver issue most definitely at the trial level and in our initial brief with regard to their sending the agreement to defend letter in February of 2005. Yeah, but that's a separate issue from waiting two years to file the deck action, isn't it? It's a separate issue. And if we disregard that – Go back to your – well, you finish and then I'll finish. We still have a company that sends a letter saying they're going to defend and they do not think the investigation – I understand both arguments, both the letter argument and the deck action argument, except that I didn't see the deck action argument until I got to your yellow brief. Until the reply brief. Okay. And it's – you're relying on the arising out of your work, not the premises. Arising out of – no, arising out of – oh, yes, your work, meaning Lenscraft's work, or work on their behalf. Or on their behalf. That is correct. Or on their behalf. All right. Those are my arguments. Okay. Thank you very much. Thank you. Mr. Postel. Let me get some water first. Sure. While you're fixing your water, think about this question. Had this issue of the two-year delay in filing the deck action come up at any time before it hit the yellow brief? No, it didn't. And I was at the circuit court arguments. Okay. It was not mentioned in their trial court briefs or at oral arguments. And the short answer to the argument, even though it's been waived, is provided in our motion to strike their reply brief. And that is, you don't measure the delay from any time prior to the suit being filed. The suit was filed, I forget the exact timeline, but I think 18 months of this two-year delay that they refer to as pre-suit. There was no complaint pending. No. So the argument was never made, so it's waived. And it has no merit whatsoever. How do you interpret, you know, your work done for you or done by you, however, how do you interpret that? Well, I'll answer the question, but it's only relevant if Illinois law controls. Right. But the answer to your question, Judge, well, let me give you the answer that the trial judge gave, which I think is right, and that is arising out of Lenscrafter's work doesn't even apply because the endorsement, which is a form endorsement, is meant to apply to either work or premises type of risks, whichever may apply for any given insured that they may face both of those exposures. But in this case, the mall would have faced only a premises exposure as an additional insured and not a work exposure. And, I mean, after all, the mall didn't hire Lenscrafters to do work, so therefore the arising out of your work concept just has no place in this case. Arising out of your premises, yes, that's an issue if Illinois law controls. Let me ask you a metaphysical question based on Lapham-Hickey, okay? Okay. And I'm quoting from it now. So that you'll know precisely what my concern is. Insurance policy provisions are generally governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance or other place bearing a rational relationship to the general contract. These factors are not all of equal significance. The weight to be accorded each depends on the issue involved. Now, what if we discover that the issue involved implicates the possibility of either New York law, Illinois law, or Ohio law, and we find that the Ohio law, under our view in Illinois, is really draconic, where we have a policy, generally speaking, of interpreting policies, and if there's an issue that's troublesome, we lean toward the insured rather than the insurer. And here we have a case where we're now being asked by the trial court to apply the law of a state that clearly is not the public policy in Illinois. Does that make any sense? I understand your question perfectly well. Under Lapham. Yes. Don't we have enough wiggle room under Lapham to say, as a matter of public policy, we're just not going to apply Ohio law? I don't think you do. And I'll tell you why. You don't? Okay. You got a case that tells us that? I do. Okay. Lyons v. Turner Construction Company. Okay. First district case from... I knew you'd have one. And I apologize to the counsel that I haven't mentioned this in my brief, but the question hasn't come up, so... No, it's really not fair, I suppose, because it really wasn't careful. It wasn't briefed in the way that I proposed the question. So maybe it was an unfair question. Well, I'd be happy to address it. What the court is referring to is the public policy exception to choice of law. Right. And that is that an Illinois court will not apply the law of a foreign state, even though a contract may call for the law of that state to apply or the Lapham-Hickey factors may call for the law of that state to apply. Could apply under Lapham-Hickey. Right. Depending on what weight we give to each factor. But the exception is that if the law of that foreign state would frustrate or thwart some important Illinois public policy concern, then an Illinois court will not apply the law of that foreign state. You've stated the argument better than I have. Thank you. Even though it goes against your position. Let me give... Lyons v. Turner, the important public policy there was the anti-indemnity statute. The contract containing the indemnity provision contained a choice of law clause that would have called for the application of the law of a foreign state that didn't have an anti-indemnity statute, or at least if it did, it was not construed like ours is. And it would have resulted in the indemnity receiving indemnity for his own negligence, which is against our public policy. Exactly. All right. But here's the point I'm trying to make, Judge. Important public policy is construed narrowly. For the purpose of departing from ordinary choice of law analysis... Well, I do want to point out, this was not raised by... I know. And he knows that, too. Well, is it the business of this intermediate reviewing court to now take on a whether or not public policy issue here of Ohio law? I don't think it is. All right. Go ahead. That's when this case gets to the Supreme Court. I just think that... I'm restricted by that. Then why are we discussing it? I apologize. I put the counsel in a difficult position. He understood the question I was raising. He had the case at the dip of his fingers. And why? Because he knew it was potentially an issue he might have to address. I had no idea you were going to ask that question. I just happened to know that case. No, you're absolutely right. I withdraw my question. All right. If I may, then, I just wanted to... Although I had some points I wanted to cover, I would like to start with some points that the justices have raised. Now, the question has been asked whether the court's focus should be on Luxottica or Lems Crafters. And those are good questions, reasonable questions. But I submit that where the focus belongs is on the insurance procurement function for the entire corporate family. And that was clearly in Ohio. And I think Emerson clearly counsels that approach. Is that what the focus was in terms of what was presented to the trial court, that this was really all about where Luxottica procured its insurance? Was that? Yes, absolutely. Mr. Montel's affidavit. And I should point out to the court that despite being given the opportunity numerous times to depose Mr. Montel, the mall defendants chose not to do so. So if there's anything in his affidavit that they feel doesn't address certain facts that they may be interested in, I think that really is something that they're going to have to live with. But if the court would direct its attention to Paragraph 7 and 8 of Mr. Montel's affidavit, he says, Mason, Ohio is the operational headquarters for nearly all of Luxottica's retail operations in North America, not just Lems Crafters, nearly all of the retail operations. Paragraph 8, he says, Since Luxottica's acquisition of U.S. Shoe, which was the former parent corporation of Lems Crafters, and through the present date, I've been responsible for all insurance procurement and negotiating for Luxottica Holdings North American retail operations. During this entire time, I've conducted all insurance procurement and negotiating for all of my office in Cincinnati, Ohio, and later in Mason, Ohio, including the policy at issue in this case. If you compare that testimony, which is unrebutted, to the discussion in Emerson Electric, I think that they align very nicely, and they support the decision that Judge Hall made in this case. Obviously, we can't have the law of the state where the accident happens controlled because then you might have 50 different interpretations of the policy. And counsel acknowledges that, I believe, but he's simply contending that the goal of uniformity can be equally attained by applying New York law. And that's true, the goal of uniformity. Well, it's certainly by applying New York law with a more liberal interpretation of basically sweeping Lems Crafters into the case. It certainly would comply with probably the intent of the lease and the language of the lease. Well, the language of the lease. Where the Woodfield Mall people were, in effect, trying to shift liability responsibility to their tenants. It's important to remember Liberty Mutual is not a party to that lease. I know. If Liberty Mutual didn't agree to provide the coverage for that lease, then they don't provide it. It wouldn't be fair to impose the obligations assumed by the mall defendants and their lease on Liberty Mutual, which didn't assume those obligations in its policy. But it raises an interesting issue as to whether Lems Crafters, being a party to that lease, should have their insurance coverage viewed in the light of that lease. Well, if they breach their contract with the mall by furnishing the wrong kind of insurance, then they're going to have to face those consequences. I knew you were going to say that, but it's not going to involve Liberty Mutual. I think they may have filed it. I'm not sure. But your argument is that they certainly can't implicate you because your policy doesn't in any way reflect what is really the philosophy of the lease. That's right. And that isn't your fault. No. If we had incorporated the lease and purported to provide coverage that conforms to the lease requirements, that would be another story. But you did not. No, we did not. You argue in your brief, though, that even if New York or Illinois law applies, they still lose. You said there's no duty. We did. We did. And I would like to focus initially on New York law. That goes back to your work again, doesn't it? And the language in your policy. It's still promises, your promises. Because Lems Crafters' work is not implicated, as Judge Hall said. Lems Crafters' work is selling eyeglasses. But he's arguing your work or work performed for you. He's arguing that this is implicated. Well, again, that's only relevant if Illinois law controls. But it's important to recognize that New York law, even if it controls, mandates the same result. They have cited cases from New York that generally give a broad construction to additional insured endorsements, like Illinois law does. And unlike Ohio law. But what they haven't done is focus on relevant cases from New York. Now, we cited a case decided by a federal district judge, the Greater New York Mutual case, with virtually identical facts, in which the court held that there was no coverage for the mall because the accident didn't happen in the store. And that case, they try to distinguish it, but the fact remains that that case relied on three previous New York appellate decisions, which stand for the same proposition, that with similarly worded endorsements, the accident has to happen in the store for the mall to be covered. So there's sort of been this assumption on my opponent's part that New York law works in his favor. It doesn't. And because there's no outcome determinative difference between New York and Ohio law, I'm not sure this court has to decide whether it's New York or Ohio law that controls. However, if you look at the factors, Ohio clearly has a more significant connection to this policy than New York because the decision makers in negotiating and procuring the policy were both in Ohio. For Liberty Mutual, the account representative was in Cincinnati. For Luxottica, the risk manager and insurance vice president was in Mason, Ohio. So for all of those reasons, we feel the court correctly decided that Ohio law controls, and there's no question under Ohio law she reached the right result. Thank you very much. Mr. Postel, thank you. Mr. Connolly, a final word. Thank you very much. I would like to respond to counsel's reference to the Greater New York case. It's important to note in the Greater New York case, that case did not provide coverage similar to the coverage provided by Liberty Mutual. In the Greater New York case, the coverage was limited to ownership and maintenance. This is a much broader policy in the Liberty Mutual policy, so they're two completely different cases. Also, there's been a lot of discussion about New York law applying. I want to make sure that this court is clear. It is our position that we believe that Ohio comes last in the list of states that this court should consider applying law to. If you look at the significant context test, the location of the subject matter and the place of performance both steer and lean toward Illinois, and depending on how you weigh it, each state has a couple of the significant context test requirements. Lastly, the policy, it's important to note, Seneca is name insured. Their address of Mr. Montel is in New York. Their first name insured doesn't mention anybody else, and it all flows from them and it all flows out of New York. That's our argument. Thank you. Mr. Connolly and Mr. Postel, thank you both. The case was very well briefed. It will be taken under advisement.